UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JONATHAN YARUS AND LLOYD BLACKWOOD,

*on behalf of themselves and all other employees similarly situated,*

Plaintiffs,

v.

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, BELLEVUE HOSPITAL CENTER, KINGS COUNTY HOSPITAL CENTER, JACOBI MEDICAL CENTER, ELMHURST HOSPITAL CENTER, HARLEM HOSPITAL CENTER, METROPOLITAN HOSPITAL CENTER, AND ALAN D. AVILES,

Defendants.

COMPLAINT- CLASS ACTION
AND DEMAND FOR JURY TRIAL

Civil Action No. 10-CV-2662

## NATURE OF CLAIM

1.     This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiff, Jonathan Yarus and Lloyd Blackwood, individually, as well as all other employees similarly situated ("Class Members"), under the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* and under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory

Judgment Statute, 28 U.S.C. § 2201; under 29 U.S.C. § 216(b); and under 18 U.S.C. § 1964(a) and (c).

3.     Venue is appropriate in the Southern District of New York since the allegations arose in this district and the defendants reside in this district.

**CLASS ACTION ALLEGATIONS**

4.     The claims arising under RICO are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

5.     The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

6.     The class consists of current and former employees of defendants who were injured by defendants' scheme to cheat employees out of their property and to convert the employees' property, including their wages and/or overtime pay, by misleading employees about their rights under the FLSA.

7.     The class size is believed to be over 30,000 employees.

8.     The Plaintiff will adequately represent the interests of the Class Members because they are similarly situated to the Class Members and their claims are typical of, and concurrent to, the claims of the other Class Members.

9.     There are no known conflicts of interest between the Plaintiff and the other Class Members.

10.     The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Plaintiffs' and Class Members' claims.

11.     The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under

federal wage and hour laws.

12.     Common questions of law and fact predominate in this action because the claims of Plaintiffs and Class Members are based on whether defendants' policies and practices of not properly paying employees for all hours worked is a part of a scheme to defraud Plaintiffs in violation of RICO.

13.     The class action is maintainable under subsections (2) and (3) of Rule 23(b) because the Plaintiffs and Class Members seek injunctive relief, common questions of law and fact predominate among the Plaintiffs and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

PARTIES

A.     **Defendants**

14.     Collectively, New York City Health and Hospitals Corporation, Kings County Hospital Center, Jacobi Medical Center, Elmhurst Hospital Center, Harlem Hospital Center, Metropolitan Hospital Center, Lincoln Medical and Mental Health Center, North Central Bronx Hospital, Coney Island Hospital and Alan D. Aviles, (collectively, "Named Defendants") are related organizations through, for example, common membership, governing bodies, and trustees and/or officers.

15.     Named Defendants' health care facilities and centers include the following: Adolescent Inpatient Unit at Kings County Hospital Center, Adult Day Healthcare Programs at Dr. Susan Smith McKinney Nursing and Rehabilitation Center, AIDS Center at Bellevue Hospital Center, AIDS Center at Harlem Hospital Center, AIDS Center at Metropolitan Hospital Center, AIDS Center at Gouverneur Healthcare Services, AIDS Center at Renaissance Health Care Network Diagnostic & Treatment Center, AIDS Center at Lincoln

Medical and Mental Health Center, AIDS Center at North Central Bronx Hospital, AIDS Center at Coney Island Hospital, AIDS Center at Woodhull Medical and Mental Health Center, AIDS Center at Cumberland Diagnostic and Treatment Center, AIDS Center at Queens Hospital Center, Ambulatory Care Center at Kings County Hospital Center, Ambulatory Care Pavilion at Queens Hospital Center, Asthma Prevention Project Center at Harlem Hospital Center, Asthma Center of Excellence at Lincoln Medical and Mental Health Center, Asthma Center of Excellence at Woodhull Medical and Mental Health Center, Bedford-Stuyvesant Alcoholism Treatment Center at King County Hospital Center, Burn Center at Harlem Hospital Center, Cancer Center of Excellence at Queens Hospital Center, Cardiac Catheterization Laboratory at Kings County Hospital Center, Cardiac Center at Kings County Hospital Center, Center for H.O.P.E. at Kings County Hospital Center, Chemical Dependency Program at Cumberland Diagnostic and Treatment Center, Children's Health Center at North Central Bronx, Choices of Healthy Alternatives for Teens (CHAT) Program at Kings County Hospital Center, Diabetes Center of Excellence at Bellevue Hospital Center, Diabetes Center of Excellence at Gouverneur Healthcare Services, Diabetes Center of Excellence at Renaissance Health Care Network Diagnostic & Treatment Center, Diabetes Center of Excellence at Lincoln Medical and Mental Health Center, Diabetes Center of Excellence at Woodhull Medical and Mental Health Center, Diabetes Center of Excellence at Queens Hospital Center, Diabetes Resource Center at Kings County Hospital Center, Dr. Susan Smith McKinney Neponsit Adult Day Health Care, Educational Vocational Rehabilitation (EVR) Program at Kings County Hospital Center, Family Care Center at Kings County Hospital Center, Family and Youth Addiction Program at Jacobi Medical Center, Food and Nutrition Program (FAN) at Kings County Hospital Center,

Geriatric Center at Jacobi Medical Center, Geriatrics Center at Kings County Hospital Center, Gouverneur Eye Center, Graduate Medical Education Training Programs at Woodhull Medical and Mental Health, Healthy Women's Partnership (WHP) at Kings County Hospital Center, HIV/AIDS Treatment Services (HATS) Clinic at East New York Diagnostic and Treatment Center, HIV Center (Project BRIEF) at Jacobi Medical Center, The Hope Pavilion at Elmhurst Hospital Center, Jacobi Burn Service, Neonatal Intensive Care Unit at Kings County Hospital Center, North Central Bronx Hospital Midwifery Program, NYU School of Medicine, NYU Department of Emergency Medicine, Bellevue Emergency Care Institute, Parental Care Assistance Program (PCAP) at Kings County Hospital Center, Parkinson's Disease Center of Excellence at Kings County Hospital Center, Pediatric Asthma Center at Kings County Hospital Center, Pediatric Emergency Department at Elmhurst Hospital Center, Pediatric HIV Services at Kings County Hospital Center, Pediatric Trauma Center at Kings County Hospital Center, Regional Perinatal Center at Bellevue Hospital Center, Regional Perinatal Center at Jacobi Medical Center, Level III Perinatal Center at Harlem Hospital Center, Level III Perinatal Center at Metropolitan Hospital Center, Level III Perinatal Center at Lincoln Medical and Mental Health Center, Level III Perinatal Center at Woodhull Medical and Mental Health Center, Level II Perinatal Center at North Central Bronx Hospital, Level II Perinatal Center at Coney Island Hospital, Level II Perinatal Center at Elmhurst Hospital Center, Level II Perinatal Center at Queens Hospital Center, Queens Cancer Center (QCC) of Queens Hospital, Queens Center of Excellence in Diabetes Management, Queens Center of Excellence for Women, Regional Trauma Center at Bellevue Hospital Center, Regional Trauma Center at Harlem Hospital Center, Regional Trauma Center at Lincoln Medical and Mental Health Center, SAFE

(SART) Center of Excellence at Bellevue Hospital Center, SAFE (SART) Center of Excellence at Metropolitan Hospital Center, SAFE (SART) Center of Excellence at Lincoln Medical and Mental Health Center, SAFE (SART) Center of Excellence at North Central Bronx Hospital, SAFE (SART) Center of Excellence at Coney Island Hospital, SAFE (SART) Center of Excellence at Woodhull Medical and Mental Health Center, SAFE (SART) Center of Excellence at Elmhurst Hospital Center, SAFE (SART) Center of Excellence at Queens Hospital Center, Senior Care Center at Queens Hospital Center, Short Term / Sub-Acute Commission on Accreditation of Rehabilitation Facilities (CARF), Accredited Rehabilitation Program at Dr. Susan Smith McKinney Nursing and Rehabilitation Center, Sleep Disorders Diagnostic Center (SDDC) at Kings County Hospital Center, STD Clinic at Kings County Hospital Center, Stroke Center at Bellevue Hospital Center, Stroke Center at Harlem Hospital Center, Stroke Center at Metropolitan Hospital Center, Stroke Center at Jacobi Medical Center, Stroke Center at Lincoln Medical and Mental Health Center, Stroke Center at Coney Island Hospital, Stroke Center at Kings County Hospital Center, Stroke Center at Elmhurst Hospital Center, Trauma Center at Jacobi Medical Center, Trauma Center at Kings County Hospital Center, Trauma Center at Elmhurst Hospital Center, Tuberculosis and Direct Observation Therapy Services at Kings County Hospital Center, Women's Health Center at North Central Bronx Hospital, Women Health Services (WHS) at Kings County Hospital Center, Women's Infant and Child Program (WIC) at Kings County Hospital, Woodhull's Paul Poroski Family Center, World Trade Center Environmental Health Center at Bellevue Hospital Center and World Trade Center Environmental Health Center at Gouverneur Healthcare Services (collectively "Health Centers").

 16. Named Defendants affiliated health care facilities and centers include the

following: Alumnae Association of the Bellevue Hospital School for Midwives, Inc., Association of Physicians and Surgeons of University and Bellevue Hospital, Inc., Auxiliary to Bellevue Hospital Center, Inc., Society of Alumni of Bellevue Hospital, Bellevue Association Inc., Bellevue Obstetrical and Gynecological Society, Children of Bellevue Inc., Auxiliary of the Bird S. Coler Memorial Hospital and Home, Inc., Goldwater Memorial Hospital Auxiliary, Inc., Auxiliary (of Gouverneur Hospital), Inc., Harlem Hospital Center Auxiliary, Inc., Alumnae Association of the Harlem Hospital School of Nursing, Inc., Alumni Association of the Harlem Hospital Center School of Nursing, Inc., Concerned Citizens Outreach To Save Harlem Hospital And Rehabilitation Services, Inc., Friends of Harlem Hospital Center, Inc., Harlem Hospital Surgical Research Fund, Inc., The Harlem Hospital Clinical Society, Inc., Metropolitan Hospital Auxiliary, Inc., Metropolitan Hospital Center Association, Inc., Metropolitan Hospital School of Nursing Alumnae Association, Inc., The Renaissance Health Care Network Auxiliary, Inc., Jacobi Medical Center Auxiliary Inc., Lincoln Hospital Auxiliary, Inc., The Hospital Auxiliary of Morrisania City Hospital, Community Auxiliary of the Morrisania Neighborhood Family Care Center, Inc., Morrisania Foundation for Medical Research, Inc., Friends of North Central Bronx Hospital Auxiliary, Inc., The Hospital Auxiliary of the Coney Island Hospital, Inc., The Social Service Auxiliary to Coney Island Hospital, Inc., Coney Island Hospital Research Institute, Inc., Cumberland Diagnostic and Treatment Center Auxiliary, Inc., Cumberland Hospital Employees Council. Inc., East New York Diagnostic and Treatment Center, Dr. Susan Smith McKinney Nursing and Rehabilitation Center, Woodhull Medical and Mental Health Center, Sea View, Hospital Rehabilitation Center and Home, East New York Diagnostic & Treatment Center Auxiliary, East New York Mental Health Clinic, Inc., Kings County Ambulatory Medicine P.C.,

Alumnae Association of the Kings County Hospital Center School of Nursing, Inc., Friends of Kings County Hospital Center, Inc., The Auxiliary of Kings County Hospital Center, Inc., Dr. Susan Smith McKinney Nursing and Rehabilitation Center Auxiliary, Inc., Dr. Susan Smith McKinney Nursing and Rehabilitation Center Community Advisory Board, Woodhull Hospital Auxiliary Board, Inc., Woodhull Medical & Mental Health Center Auxiliary, Inc., Dental Associates of Woodhull, P.C., Medical Associates of Woodhull, P.C., Woodhull Medical Care, P.C., Woodhull Geriatric Health Task Force, Inc., the Auxiliary of Elmhurst Hospital Center of the New York City Health and Hospitals Corporation, Inc., Elmhurst Medical Administrators Inc., Elmhurst Medical Group P.C., Coler-Goldwater Specialty Hospital and Nursing Facility, Morrisania Diagnostic and Treatment, Segundo Ruiz Belvis Diagnostic and Treatment Center, Cumberland Diagnostic and Treatment Center, Elmhurst Podiatry Group, P.C., Queens Hospital Center Auxiliary, Inc., Queens Hospital Center Cancer Research Society, Inc., Sea View Hospital and Home Auxiliary, Inc., Social Service Committee of Sea View Hospital, Inc., Mt. Sinai School of Medicine and New York Medical College (collectively, "Affiliates").

17.     Together the Named Defendants, the Health Centers and the Affiliates are referred to as "New York City Health and Hospitals Corporation" or "defendants."

18.     New York City Health and Hospitals Corporation is an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

19.     Defendants operate over 150 health care facilities and centers and employ approximately 30,000 individuals.

20.     Defendants constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

21.    For example, defendants have centralized supply chain management, and financial, computer, payroll and health records systems that are integrated throughout their locations.

22.    Further, defendants' labor relations and human resources are centrally organized and controlled, including the maintenance of system-wide policies and certain employee benefit plans.

23.    Defendants share common management, including oversight and management by a senior executive team and board of directors.

24.    Defendants have common ownership.

25.    At all relevant times, New York City Health and Hospitals Corporation has suffered or permitted Plaintiffs and Class Members to perform work for it at its various health care locations.

26.    Plaintiffs and Class Members are or have been employed by New York City Health and Hospitals Corporation and/or have been jointly employed by New York City Health and Hospitals Corporation.

27.    New York City Health and Hospitals Corporation operates locations, either directly or indirectly through the Health Centers and Affiliates, and therefore is the employer of Plaintiffs and Class Members who are or were employed at all locations.

28.    As such, defendants are the employer (single, joint or otherwise) of the Plaintiffs and Class Members and/or alter egos of each other.

29.    In light of the economic realities of the enterprise operated by New York City Health and Hospitals Corporation, New York City Health and Hospitals Corporation is a joint employer of Plaintiff and Class Members.

30.     Collectively, New York City Health and Hospitals Corporation comprises a single, integrated enterprise, as they perform related activities through common control for a common business purpose.

31.     Defendants also engage in a joint venture for providing healthcare services by entering an agreement, established through their conduct in sharing the profits and losses.

32.     Defendants jointly managed and controlled this venture as well as its employees and assets.

33.     Defendants are jointly and severally liable to the class members for the damages arising out of this joint venture.

34.     Mr. Alan D. Aviles is the President and CEO of New York City Health and Hospitals Corporation.

35.     Mr. Aviles' responsibilities include actively managing New York City Health and Hospitals Corporation.

36.     In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern the policies defendants adopt and the implementation of those policies.

37.     In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment, human resources, training, benefits, and payroll.

38.     Due in part to his role as President, Mr. Aviles is actively involved in the creation of the illegal policies complained of in this case.

39.     Due in part to his role as President, Mr. Aviles actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

40.    Due in part to his role as President, Mr. Aviles actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

41.    In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiff and Class Members.

42.    In concert with others, Mr. Aviles has the authority to, and does, make decisions that concern employees' schedules, hours and standard benefit levels.

43.    Mr. Aviles has the authority to, and does, make decisions that concern standard pay scales.

44.    Mr. Aviles  has the authority to, and does, make decisions that concern defendants' human resources policies, the resolution of issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

45.    Mr. Aviles has the authority to, and does, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

46.    Mr. Aviles has the authority to, and does, make decisions that concern training and education functions across New York City Health and Hospitals Corporation.

47.    Mr. Aviles has the authority to, and does, make decisions that concern the type and scope of training employees must attend as well as any compensation they receive for attending training.

48.    Mr. Aviles has the authority to, and does, make decisions that concern payroll

functions across New York City Health and Hospitals Corporation.

49.     Mr. Aviles has the authority to, and does, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

50.     Upon information and belief, Mr. Aviles has the authority to, and does, make decisions that concern benefit plans across New York City Health and Hospitals Corporation.

51.     Upon information and belief, Mr. Aviles has the authority to, and does, make decisions that concern the type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

52.     Because Mr. Aviles has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiff and Class Members, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Aviles has the power to hire and fire employees.

53.     Because Mr. Aviles has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Aviles supervises and controls employees' work schedules and/or conditions of employment.

54.     Because Mr. Aviles has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Aviles determines the rate and method of employees' payment.

55.     Because Mr. Aviles has authority with respect to defendants' centralized records, including a database regarding employees' employment records, benefits, and systems for keeping and maintaining payroll, and other employment-related records, Mr. Aviles maintains employees' employment records.

56.     Because Mr. Aviles provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiffs and Class Members.

57.     Because Mr. Aviles is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, he actively participates in the violations complained of in this action.

58.     Based upon the foregoing, Mr. Aviles is liable to Plaintiffs and Class Members because of his active role in operating the business, his status as an employer, and/or according to federal law.

**B.      Plaintiffs**

*Named Plaintiff*

59.     At all relevant times, Jonathan Yarus and Lloyd Blackwood ("Plaintiffs") were employees under the FLSA, and employed within this District.

*Class Members*

60.     The Class Members are those employees of defendants who were suffered or permitted to work by defendants and not paid their regular or statutorily required rate of pay for all hours worked.

## FACTUAL BACKGROUND

61.     New York City Health and Hospitals Corporation is a large health care provider in New York.

62.     As discussed below, defendants maintained several illegal pay policies that denied Plaintiffs and Class Members compensation for all hours worked, including applicable premium pay rates.

*Meal and Break Deduction Policy*

63.     Pursuant to defendants' "Meal and Break Deduction Policy," defendants' computerized timekeeping system automatically deducts time from employees' paychecks each day for meals, breaks and other reasons.

64.     Despite having this policy, defendants do not ensure that Plaintiffs and Class Members perform no work during the breaks.

65.     Plaintiffs and Class Members do in fact perform work during those breaks and are not paid for that time.

66.     Defendants know that the Plaintiffs and Class Members perform work during

these meals, breaks and other times, but still do not pay them for this time pursuant to their Meal and Break Deduction Policy.

67.      Defendants maintain the Meal and Break Deduction Policy throughout their facilities and centers.

68.      Plaintiffs and Class Members allow defendants to operate on a 24/7 basis, and in doing so, Plaintiffs and Class Members often perform compensable work for defendants during their uncompensated breaks.

69.      Defendants do not prohibit Plaintiffs and Class Members from working during their meal breaks or breaks and do not have rules against such work.

70.      Although defendants' policy deducts time each shift, defendants expect Plaintiffs and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.

71.      Plaintiffs and Class Members are not relieved by another employee when their break comes, or asked to leave their work location.

72.      Defendants know that Plaintiffs and Class Members perform work during their unpaid breaks.

73.      For example, Plaintiffs and Class Members perform work for the defendants, on defendants' premises, in plain sight, and at management's request.

74.      Defendants' management has repeatedly observed Plaintiffs and Class Members working though their unpaid breaks.  Defendants' management has gone so far as to direct Plaintiffs and Class Members to work during their unpaid breaks even though defendants' management knew that they would not be able to have a full break.

75.      Plaintiffs and Class Members had conversations with defendants' managers in

-15-

which they discussed how they were working through their unpaid periods and were not getting paid for such work.

76.     When questioned by employees about the Meal and Break Deduction Policy, the defendants affirmatively stated that the employees were being fully paid for the work time for which they were entitled to be paid, even though defendants knew compensable work time was being excluded from the employees' pay.  Such conversations occurred with Plaintiffs and Class Members on a number of occasions.  These representations were part of a course of conduct (*see e.g.*, ¶¶ 90-94, 110-120) to defraud Plaintiffs and Class Members from the pay they were owed, and to mislead them into believing they had been fully paid as required by law.

77.     Further, given the demands of the health care industry and short staffing, defendants' management knew that to get the tasks done they assigned to Plaintiffs and Class Members, when they needed to get done, Plaintiffs and Class Members had to work through their breaks, even during times they were not paid for their meals and breaks.

78.     Even though defendants know their employees are performing such work, defendants fail to compensate their employees for such work.

79.     All Plaintiffs and Class Members are subject to the Meal and Break Deduction Policy and are not fully compensated for work they perform during breaks, including, without limitation, hourly employees working at New York City Health and Hospitals Corporation's facilities and centers, such as secretaries, housekeepers, custodians, clerks, porters, registered nurses, licensed practical nurses, transport nurses, nurse aides, administrative assistants, anesthetists, clinicians, medical coders, medical underwriters, nurse case managers, nurse interns, nurse practitioners, nurse aides, practice supervisors, professional staff nurses, quality

coordinators, resource pool nurses, respiratory therapists, senior research associates, operating room coordinators, surgical specialists, admissions officers, student nurse techs, trainers, transcriptionists, occupational therapists, occupational therapy assistants, physical therapists, physical therapy assistants, radiation therapists, staff therapists, angiotechnologists, x-ray technicians, CAT scan technicians, mammographers, MRI technologists, sleep technologists, surgical technologists, radiographers, phlebotomists, respiratory technicians, respiratory care specialists, respiratory care practitioners, clinical coordinators, medical assistants, home care nurses, home health aides, clinical case managers, midwives and other health care workers.

80.     Plaintiffs and Class Members are entitled to compensation for all time they performed work for defendants, including during their unpaid breaks.

81.     In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent working during breaks often would include work that should have been calculated at applicable premium pay rates.

82.     Plaintiffs and Class Members subject to the Meal and Break Deduction Policy are members of Subclass 1.

### Unpaid Preliminary and Postliminary Work Policy

83.     Defendants suffered or permitted Plaintiffs and Class Members to perform work before and/or after the end of their scheduled shifts.

84.     However, defendants failed to pay Plaintiffs and Class Members for all time spent performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Preliminary and Postliminary Work Policy").

85.     In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent performing work before and/or after their shifts often would have

-17-

included work that should have been calculated at applicable premium pay rates.

86.     Plaintiffs and Class Members subject to the Unpaid Preliminary and Postliminary Work Policy are members of Subclass 2.

**_Additional Allegations_**

87.     Plaintiffs and Class Members were subject to defendants' timekeeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the Unpaid Work Policies.

88.     Even though New York City Health and Hospitals Corporation knew its employees are performing such work, New York City Health and Hospitals Corporation fails to compensate its employees for such work.

89.     Defendants' practice is to be deliberately indifferent to these violations of the statutory wage and overtime requirements.

90.     Through the paystubs and payroll information it provided to employees, New York City Health and Hospitals Corporation deliberately concealed from its employees that they did not receive compensation for all compensable work that they performed and misled them into believing they were being paid properly.

91.     Further, by maintaining and propagating the illegal Unpaid Work Policies, defendants deliberately misrepresented to Plaintiffs and Class Members that they were being properly paid for all compensable time, even though Plaintiffs and Class Members were not receiving pay for all time worked including applicable premium pay.

92.     The defendants engaged in such conduct and made such statements to conceal from the Plaintiffs and Class Members their rights and to frustrate the vindication of the employees' federal rights.

93.     As a result, employees were unaware of their claims.

94.     Defendants' failure to pay overtime as required by the FLSA is willful.

95.     Defendants, however, at all times, intended to violate applicable federal laws by failing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked including applicable premium pay.

96.     Among the relief sought, Plaintiffs and Class Members seek injunctive relief to prevent defendants from continuing the illegal policies and practices perpetuated pursuant to the Unpaid Work Policies.

97.     Defendants failed to keep accurate records of all time worked by Plaintiffs and Class Members.

98.     As used in this Complaint, "mailed" means: (1) placing in any post office or authorized depository for mailed matter, any matter or thing to be delivered by the United States Postal Service; (2) causing to be deposited any matter or thing to be delivered by any private or commercial interstate carrier; (3) taking or receiving therefrom any such matter or thing; and/or (4) knowingly causing to be delivered by any such means any such matter.

99.     Plaintiffs and Class Members allege that defendants devised, intended to devise, and carried out a scheme to cheat Plaintiffs and Class Members out of their property and to convert Plaintiffs' and Class Members' property, including their wages and/or overtime pay (the "Scheme"). Defendants' Scheme consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked in violation of federal law, as described previously in this Complaint.

100.    Defendants' Scheme involved the employment of material misrepresentations

-19-

and/or omissions and other deceptive practices reasonably calculated to deceive Plaintiffs and Class Members. The Scheme involved depriving Plaintiffs and Class Members of their lawful entitlement to wages and overtime.

101.    In executing or attempting to execute the Scheme and to receive the financial benefits of the Scheme, defendants repeatedly mailed payroll checks, either directly to Plaintiffs and Class Members or between defendants' business locations. These mailings occurred on a regular basis and more than 100 such mailings occurred in the last 10 years.

102.    The payroll checks were false and deceptive because they misled Plaintiffs and Class Members about the amount of wages to which they were entitled, and whether defendants had included all compensable work time, as well as their status and rights under the FLSA. Plaintiffs and Class Members relied to their detriment on the misleading payroll checks that defendants mailed and those misleading documents were a proximate cause of Plaintiffs' and Class Members' injuries.

103.    Defendants' predicate acts of mailing the misleading payroll checks in furtherance of their Scheme constitute a pattern of conduct unlawful pursuant to 18 U.S.C. § 1961(5) based upon both the relationship between the acts and continuity over the period of time of the acts. The relationship was reflected because the acts were connected to each other in furtherance of the Scheme. Continuity was reflected by both the repeated nature of the mailings during and in furtherance of the Scheme and the threat of similar acts occurring in the future. The threat was reflected by the continuing and ongoing nature of the acts.

104.    Defendants' predicate acts were related, because they reflected the same purpose or goal (to retain wages and overtime pay due to Plaintiffs and Class Members for the economic benefit of defendants and members of the enterprise); results (retention of

wages and overtime pay); participants (defendants and other members of the enterprise); victims (Plaintiffs and Class Members); and methods of commission (the Scheme and other acts described in the Complaint).  The acts were interrelated and not isolated events, since they were carried out for the same purposes in a continuous manner over a substantial period of time.

105.    At all relevant times, in connection with the Scheme, defendants acted with malice, intent, knowledge, and in reckless disregard of Plaintiffs' and Class Members' rights.

106.    Each of the Plaintiffs and Class Members is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

107.    Each defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

108.    Defendants were members of an "enterprise" under 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in or the activities of which affected interstate and foreign commerce.

109.    Each defendant received income from a pattern of conduct unlawful under RICO, in which defendants participated through continuous instances of providing Plaintiffs and Class Members with misleading documents which defendants mailed and upon which Plaintiffs and Class Members relied to their detriment.

110.    Plaintiffs and Class Members were injured in their business and property under 18 U.S.C. § 1964(c) by reason of defendants' commission of conduct which was unlawful under RICO.

111.    Every wage payment that the defendants mailed to the Plaintiffs and Class Members as part of the Scheme constituted a new legal injury to the Plaintiffs and Class

Members.

112.    Therefore, each and every improper payment within the relevant statute of limitations period constitutes a new legal injury and the Plaintiffs and Class Members are entitled to recover based on the reduction in each improper payment.

113.    Additionally, as set forth in the allegations above, including ¶¶ 76, 110-120, the defendants fraudulently concealed from the Plaintiffs and Class Members the facts that are the basis for their claims. Further, such conduct by the defendants equitably tolls the statute of limitations covering Plaintiffs' and Class Members' claims.

114.    Because of such conduct, the Plaintiffs and Class Members did not discover in the relevant statute of limitations period that the defendants were not paying them properly.

115.    The Plaintiffs and Class Members exercised due diligence, but still were unaware of their rights.

116.    The Plaintiffs and Class Members are not experts in proper payment under federal labor laws, and more specifically are not aware of what time is compensable for interrupted and missed meal breaks, nor how the defendants' internal computer systems were determining the amount they were being paid.

117.    Further, when questioned, the defendants falsely assured Plaintiffs and Class Members that the defendants understood federal and state labor laws and that based on that knowledge, the defendants were ensuring that they were properly paying the Plaintiffs and Class Members.

118.    The defendants made this representation despite the fact that such claims were false, fully knowing that Plaintiffs and Class Members were relying on the defendants' "expertise" and assurances.

119.    Further, these assurances were not contradicted by the information in legal postings required by state or federal law to be displayed prominently at places of work to which Plaintiffs and Class Members had access.

120.    Prior to seeking legal advice from Class Counsel, the Plaintiffs were never alerted to the defendants' concealment of their violation of the law by failing to pay the Plaintiffs and Class Members properly.

121.    Further, not until the commencement of this action were Class Members made aware that the defendants' conduct in fact violated the law.

122.    Plaintiffs and Class Members were not classified as exempt employees because hourly employees do not fall under one of the enumerated exemptions under the FLSA.

## FIRST CAUSE OF ACTION
### *FLSA*

123.    Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

124.    Defendants willfully violated their obligations under the FLSA and are liable to Plaintiff and Class Members.

## SECOND CAUSE OF ACTION
### *RICO*

125.    Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

126.    Plaintiffs and Class Members bring these claims under 18 U.S.C. § 1964(c), which confers on private individuals the right to bring suit for any injury caused by a violation of 18 U.S.C. § 1962.

127.    Defendants' conduct, and the conduct of other members of the enterprise,

injured Plaintiffs and Class Members by refusing to pay their regular or statutorily required rate of pay for all hours worked.  Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, by devising a Scheme to obtain Plaintiffs' and Class Members' property by means of false or fraudulent representations, at least some of which were made in the misleading payroll checks which defendants mailed.

WHEREFORE, Plaintiffs and Class Members demand judgment against defendants in their favor and that they be given the following relief:

(a)     an order preliminarily and permanently restraining defendants from engaging in the aforementioned pay violations;

(b)     an award crediting Plaintiff and Class Members for all hours worked;

(c)     an award of the value of Plaintiffs' and Class Members' unpaid wages;

(d)     liquidated damages under the FLSA equal to the sum of the amount of wages and overtime which were not properly paid to Plaintiffs and Class Members;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiffs' and Class Members' rights;

(f)     an award of pre- and post-judgment interest; and

(g)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

<u>JURY DEMAND</u>

Plaintiffs demand a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: March 24, 2010

THOMAS & SOLOMON LLP

By: _____

Justin M. Cordello, Esq.
*Attorneys for Plaintiff and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
jcordello@theemploymentattorneys.com